IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:25-cv-00063-MR-WCM

| | |
|---|---|
| LINDA SHYANNE STIDHAM, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>ANDREW BEAL, )<br>)<br>Defendant. )<br>_____ ) | **MEMORANDUM OF<br>DECISION AND ORDER** |

**THIS MATTER** is before the Court on Defendant Andrew Beal's Motion for Summary Judgment [Doc. 12].

**I.    BACKGROUND**

The Plaintiff Linda Shyanne Stidham ("Plaintiff"), proceeding *pro se*, filed this action pursuant to 42 U.S.C. § 1983, against Andrew Beal, a Cleveland County deputy sheriff, in his official capacity. [Doc. 5 at 2]. The Plaintiff alleges in the unverified Amended Complaint that Defendant Beal violated her Fourth and Fourteenth Amendment rights and Article I, Section 19, of the North Carolina Constitution.

On November 5, 2025, the Defendant filed the instant Motion for Summary Judgment and supporting materials. [Doc. 12; see Docs. 13, 12-1, 12-2, 12-3]. Thereafter, the Court entered an order in accordance with

Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to Defendant's summary judgment motion and of the manner in which evidence could be submitted to the Court. [Doc. 14]. The Plaintiff has not responded, and the deadline for doing so has expired.[1] These matters are ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine

---

[1] The Plaintiff is not a prisoner and, in any event, the Complaint and Amended Complaint are unverified and thus are of no evidentiary value on summary judgment. See generally Goodman v. Diggs, 986 F.3d 493, 498-99 (4th Cir. 2021) (holding that a district court is to consider verified prisoner complaints as affidavits on summary judgment "when the allegations contained therein are based on personal knowledge").

issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. "Although the failure of a party to respond to a summary judgment motion may leave uncontroverted those facts established by the motion, the moving party must still show that the uncontroverted facts entitle the party to a 'judgment as a matter of law.'" Custer v. Pan American Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993). "Therefore, even when the adverse party fails to respond to the motion for summary judgment, the court must review the motion and the materials before the court to determine if the moving party is entitled to summary judgment as a matter of law." Meyer v. Qualex, Inc., 388 F. Supp. 2d 630, 634 (E.D.N.C. 2005); see also Fed. R. Civ. P. 56(e). When making that determination, the Court views the pleadings and material presented in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's favor. Smith v. Collins, 964 F.3d 266, 274 (4th Cir. 2020).

## III. FACTUAL BACKGROUND

The relevant forecast of evidence viewed in the light most favorable to Plaintiff shows the following.

On March 8, 2023, the Defendant was working a patrol shift. [Doc. 12-1: Beal Decl. at ¶ 2]. Before starting his shift, the Defendant checked the Sheriff's "hot sheet," a computerized list of arrest warrants and Orders for Arrest ("OFA") that had been issued for residents in his assigned patrol zone. [Id. at ¶ 3]. Deputies are expected to locate and arrest the subjects of the warrants and OFAs as time permits. [Id.].

The "hot sheet" displayed an OFA for Linda Stidham (misspelled "Steidham") that was listed as "unserved." [Id.; Doc. 12-2: MSJ Ex (OFA)]. The Defendant used his vehicle's computer to pull up the Plaintiff's criminal history in North Carolina's law enforcement database, which displayed information about unresolved misdemeanor driving charges. [Doc. 12-1: Beal Decl. at ¶ 4]. The Defendant recognized the Plaintiff's photograph; he knew the Plaintiff's reputation as a heavy drug user and he believed her to be a convicted felon. [Id.]. The Defendant proceeded to the mobile home where the Plaintiff lived. [Id. at ¶ 4]. Deputy Michael Tinoco, who is not a defendant in this matter, accompanied him. [Id. at ¶ 5].

The Defendant and Deputy Tinoco proceeded to the Plaintiff's mobile home in separate patrol cars. [Id.]. The area was very dark. The Defendant saw a light coming from a window on the trailer's right side as they approached on foot. [Id.]. While Deputy Tinoco climbed the steps to the

mobile home's front door, the Defendant stepped onto the hitch adjacent to the mobile home's right side window, hoping to see into the room. [Id.]. According to the Defendant, "This was a standard officer safety practice to look for any occupants and/or activity of concern before alerting the occupants to [their] presence." [Id.].

Deputy Tinoco knocked on the front door, a male voice responded, and the Defendant observed through the window as a male subject, later identified as Jacob Ellis, walk towards the front door. [Id. at ¶ 6]. The Defendant then saw a female subject, whom he recognized as the Plaintiff, get up from the bed wearing a hat and holding a revolver in her right hand. [Id.]. The Defendant immediately directed Deputy Tinoco to get off the porch, the Defendant drew his gun, and both officers took cover in the yard. [Id.].

Ellis opened the front door and stepped onto the porch. The Defendant told him that the Plaintiff was under arrest and that she needed to put her pistol down and come outside. [Id. at ¶ 7]. When the Plaintiff exited the front door with nothing in her hands, the Defendant took her into custody, handcuffed her, and placed her in his patrol vehicle. The Defendant asked whether the Plaintiff owned the mobile home and she said that she did, and that Ellis, her boyfriend, had lived there for about a year. [Id. at ¶ 8]. A check

on the Defendant's computer confirmed that the Plaintiff had a prior felony conviction. [Id.].

The Defendant returned to where Deputy Tinoco and Ellis were talking outside the trailer. Tinoco said that Ellis admitted that the Plaintiff had a revolver. [Id. at ¶ 8]. Ellis indicated that he knew where the revolver was located, and he took the Defendant inside after the Defendant assured him that he only wanted the revolver. [Id.]. Once inside, Ellis led the Defendant to the bedroom where he had first seen the Plaintiff through the window, and suggested that the Defendant look for the gun under the mattress, pillows, and blankets. [Id. at ¶ 9]. The Defendant could not find the gun.

The Defendant returned to the patrol vehicle to confront the Plaintiff. She waived her Miranda rights and, after the Defendant explained that he had observed her holding a revolver in the bedroom, she denied having a handgun but admitted to having BB guns. [Id.]. The Defendant told her that he was not leaving the residence until the gun was found. The Plaintiff then suggested a few locations in the bedroom where Defendant should look for the weapon she had been holding, but these suggestions were fruitless. [Id.]. The Defendant finally found a loaded pistol on a desk, under the hat that the Plaintiff had been wearing. [Id. at ¶ 10].

6

When the Defendant returned to the vehicle, the Plaintiff said she was positive that she did not have any outstanding charges or warrants. [Id. at ¶ 11]. Deputy Tinoco then alerted the Defendant that a computer check just showed that Plaintiff's OFA had been recalled. [Id.]. Using his own computer, the Defendant confirmed that the OFA had been recalled, with the confusion having arisen from the Sheriff's Office recent switch to a different warrant system. [Id.]. As of March 8, 2023, the Defendant had not yet been trained in an aspect of the new system which requires an extra step to ensure that an "unserved" warrant is still valid and had not been recalled. [Id.].

Upon realizing his error, the Defendant apologized to the Plaintiff and uncuffed her. [Id. at ¶ 12]. He told the Plaintiff that he would be contacting the district attorney about her possession of a firearm, and she offered for officers to keep the gun. The Defendant and Deputy Tinoco cleared the scene and booked the gun into evidence.

The next day, an Assistant D.A. instructed the Defendant to obtain an arrest warrant charging the Plaintiff with possession of a firearm by a convicted felon. [Id.]. The Defendant proceeded to the local magistrate's office and testified regarding his discovery of the gun. The magistrate issued a warrant for the Plaintiff's arrest, and a grand jury indicted her for possession of a firearm by a felon. [Id.; Doc. 12-3 (Arrest Warrant)]. The

Defendant was later informed that the charge had been voluntarily dismissed on April 17, 2025 due to "prosecutorial discretion." [Id.].

## IV. DISCUSSION

The Fourth Amendment, which applies to the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures…."[2] U.S. CONST. amend. IV; Mapp v. Ohio, 367 U.S. 643, 655 (1961). "A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed." United States v. Jacobsen, 466 U.S. 109, 113 (1984). A warrantless search of an individual's home is presumptively unreasonable. Brigham City v. Stuart, 547 U.S. 398, 403 (2006); United States v. Contreras, 149 F.4th 349, 373-74 (4th Cir. 2025). The curtilage immediately surrounding the home is considered part of the home for Fourth Amendment purposes. Fla. v. Jardines, 569 U.S. 1, 5-7 (2013).

A valid arrest warrant implicitly authorizes an officer to enter a dwelling where the suspect lives when there is "reason to believe that the suspect is

---

[2] Insofar as the Plaintiff attempts to state a separate Fourteenth Amendment claim, it is dismissed. See generally Smith v. Travelpiece, 31 F.4th 878 (4th Cir. 2022) ("Dressing a Fourth Amendment claim up in due process language does not transform it into a Fourteenth Amendment claim").

8

Case 1:25-cv-00063-MR-WCM   Document 15   Filed 03/11/26   Page 8 of 14

within." Payton v. New York, 445 U.S. 573, 603 (1980); United States v. Brinkley, 980 F.3d 377, 384-86 (4th Cir. 2020) (probable cause is required to believe the location is the defendant's residence, and that the defendant will be home). An officer not armed with a warrant may approach a home by the front path, knock, and wait briefly to be received. Kentucky v. King, 563 U.S. 452, 470 (2011). An officer may bypass the front door when circumstances reasonably indicate that the officer might find the homeowner elsewhere on the property. Covey v. Assessor of Ohio Cnty, 777 F.3d 186, 193 (4th Cir. 2015). When a police investigation takes place in a constitutionally protected area, the question is whether it was accomplished through an unlicensed physical intrusion. Id. at 7.

Here, the Plaintiff sues Defendant Beal only in his official capacity. [Doc. 5 at 2]. A suit against a deputy sheriff in his official capacity is in substance a claim against the office of the sheriff itself. Gannt v. Whitaker, 203 F.Supp.2d 503, 508 (M.D.N.C. Feb. 26, 2002). To succeed on such a claim, a plaintiff must demonstrate that a Sheriff's Office policy or custom resulted in the violation of federal law. See Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 694 (1978) (holding that in an official capacity suit, the entity's "policy or custom" must have played a part in the violation of federal law); Oklahoma City v. Tuttle, 471 U.S. 808, 818-20 (1985)

(discussing same). Municipal liability under § 1983 cannot be predicated upon a respondeat superior theory. Burgess v. Goldstein, 997 F.3d 541, 562 (4th Cir. 2021). Liability arises only when the offensive acts are taken in furtherance of municipal policy or custom. Id.; see City of Canton, Ohio v. Harris, 489 U.S. 378, 389 (1989) (a municipality can be liable under § 1983 only where its policies are the "moving force" behind the constitutional violation) (quoting Polk Cnty. v. Dodson, 454 U.S. 312, 326 (1981)).

There are three necessary elements for Monell liability. First, the plaintiff must plausibly allege a constitutional harm that stems from the acts of a municipal employee "taken in furtherance of some municipal 'policy or custom.'" Milligan v. City of Newport News, 743 F.2d 227, 229 (4th Cir. 1984) (quoting Monell, 436 U.S. at 694); see also Spell v. McDaniel, 824 F.2d 1380, 1389 (4th Cir. 1987). A policy, custom or practice can exist in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train [employees], that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law." Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003) (quoting Carter v. Morris, 164 F.3d 215, 218 (4th

Cir. 1999)). Second, the plaintiff must allege facts showing that the policy's creation is fairly attributable to the municipality. Spell, 824 F.2d at 1389; see also Owens v. Balt. City State's Attorney's Office, 767 F.3d 379, 402 (4th Cir. 2014) ("Only if a municipality subscribes to a custom, policy, or practice can it be said to have committed an independent act, the *sine qua non* of Monell liability."). Third, the plaintiff must allege an affirmative causal link between the "policy or custom," and the particular injury suffered by the plaintiff. Spell, 824 F.2d at 1389.

The evidence before the Court is insufficient to demonstrate the existence of a genuine dispute of material fact regarding the Defendant's Monell liability.³ There is no forecast of evidence that the "standard officer safety practice" which led Defendant Beal to step onto the trailer hitch was an express, official policy adopted through a final policymaker. See, e.g., Howard v. City of Durham, 68 F.4th 934 (4th Cir. 2023) (affirming summary judgment for the city because there was no evidence that the city had an express policy of withholding Brady evidence). Nor is there a forecast of evidence that the standard practice "to look for any occupants and/or activity

---

³ Because the Plaintiff has not asserted a Fourth Amendment claim against Defendant Beal in his individual capacity, the Court need not determine: whether he violated the Fourth Amendment by stepping onto the trailer's hitch and peering into the side window while mistakenly believing that he had a valid OFA; applicability of the plain view doctrine; the validity of Ellis's consent; or whether Defendant Beal is entitled to qualified immunity.

11

of concern before alerting the occupants to our presence" resulted in a persistent and widespread practice of unconstitutional conduct such that policymakers had actual or constructive knowledge of the improper custom, and were deliberately indifferent to the same; the single incident in the Plaintiff's case is insufficient. See, e.g., Randall v. Prince George's Cnty., Md., 302 F.3d at 211 (affirming summary judgment for the county where there was no evidence that the county police routinely detained witnesses against their will who expressed their desire to leave); Owen v. Goodwin, No. 1:21-CV-00217-MR-WCM, 2023 WL 6446204, at *5 (W.D.N.C. Sept. 29, 2023) (granting summary judgment for defendants where plaintiff did not present evidence of a single other incident involving the use of excessive force by a sheriff's deputy, such that no reasonable juror could conclude that there was a custom or practice). There also is no forecast of evidence that there was a specific training deficiency with regard to the standard officer safety practice which resulted in a violation of the Plaintiff's rights. The only forecast of evidence in this regard was that the Defendant had not yet been trained on the new computer system for validating OFAs. A one-time incident of training neglect is insufficient to support a Monell claim. See Kissinger-Stankevitz v. Town of Tappahannock, 750 F.Supp.3d 590, 616 (E.D. Va. 2024) (evidence that a single officer's training was deficient cannot

12

attribute deficient training to the whole of the police force). In short, there is no forecast of evidence demonstrating that the Plaintiff suffered an injury that was fairly attributable to an unconstitutional official or widespread policy or custom.[4] The Defendant's Motion for Summary Judgment will, therefore, be granted on the Plaintiff's Fourth Amendment claim.

The Plaintiff purports to assert a claim under Article I, Section 19 of the North Carolina Constitution. However, the Plaintiff does not dispute that she has an adequate state law remedy. [See Doc. 13 at 11]. Her direct reliance on the North Carolina Constitution is, therefore, precluded. See generally Corum v. Univ. of N.C. ex rel. Bd. of Gov., 330 N.C. 761, 413 S.E. 2d 276, 289 (1992); see, e.g., Cates v. Sandoval, 1:20-cv-200, 2020 WL 5665537 (M.D.N.C. Sept. 23, 2020) (noting that North Carolina courts have identified adequate state claims such as false imprisonment and trespass to chattels that correspond to claims for unreasonable search and seizure under the North Carolina Constitution). Moreover, the Plaintiff has failed to forecast any evidence demonstrating the existence of a genuine dispute of material fact that any due process violation under § 19 occurred. See McNeill v. Harnett Cnty., 327 N.C. 552, 563, 398 S.E.2d 475, 481 (N.C. 1990) (Section

---

[4] To the extent that the Plaintiff attempts to proceed on a *respondeat superior* theory, such claim also fails. See Burgess, 997 F.3d at 562.

19 is synonymous with Fourteenth Amendment due process).[5] The Defendant's Motion for Summary Judgment is, therefore, granted as to the Plaintiff's state law claim as well.

## V. CONCLUSION

For the reasons stated herein, the Defendant's Motion for Summary Judgment is granted, and this action is dismissed with prejudice.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Defendant's Motion for Summary Judgment [Doc. 12] is **GRANTED**, and this action is **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED.**

Signed: March 10, 2026

Martin Reidinger
Chief United States District Judge

---

[5] To the extent that the Plaintiff may have meant to assert a claim of unreasonable search and seizure under Article 1, Section 20 of the North Carolina Constitution, which is analogous to the Fourth Amendment, such claim would also fail. State v. Hendricks, 43 N.C. App. 245, 251-52, 258 S.E.2d 872, 877 (1979), disc. rev. denied, 299 N.C. 123, 262 S.E.2d 6 (1980). The Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact that her Fourth Amendment rights were violated pursuant to a custom or policy as discussed *supra*, and a claim under § 20 would be dismissed for the same reasons. See, e.g., Sunkler v. Town of Nags Head, 2:01-cv-22, 2002 WL 32395571 (E.D.N.C. May 17, 2002) (granting defendants summary judgment on plaintiff's Fourth Amendment and North Carolina search and seizure claims under the same analysis).